No. 23-4443

In The

# United States Court of Appeals

### For The Fourth Circuit

———————

UNITED STATES OF AMERICA,

Appellant,

v.

DAVID GERALD MINKKINEN
SIVARAMAN SAMBASIVAM,

Appellees.

———————

Appeal from the United States District Court
for the Southern District of West Virginia
*The Honorable Irene C. Berger, United States District Judge*

———————

Brief of Appellant the United States of America

———————

WILLIAM S. THOMPSON
United States Attorney

JENNIFER RADA HERRALD
Assistant United States Attorney
300 Virginia Street, East, Room 4000
Charleston, West Virginia 25301
(304) 345-2200

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. ii

STATEMENT OF JURISDICTION ................................................. 1

ISSUE PRESENTED...................................................................... 1

STATEMENT OF THE CASE ........................................................ 2

SUMMARY OF ARGUMENT..................................................... 13

ARGUMENT

    **The district court erred by dismissing ten counts of the superseding indictment for pre-indictment delay because the defendants failed to meet their burden to show actual prejudice and the reasons for the delay were justified**................................................................15

CONCLUSION............................................................... 47

# TABLE OF AUTHORTIES

**Cases**                                                                 **Pages**

*Arizona v. Youngblood,*
    488 U.S. 51 (1988) ........................................................................ 29

*Howell v. Barker,*
    904 F.2d 889 (4th Cir. 1990) ........................................................ 16, 40

*Jones v. Angelone,*
    94 F.3d 900 (4th Cir. 1996) .......................................................... 16, 17

*Stoner v. Graddick,*
    751 F.2d 1535 (11th Cir. 1985) ..................................................... 16-17

*United States v. Automated Medical Laboratories,*
    770 F.2d 399 (4th Cir. 1985) ........................................................ passim

*United States v. Burns,*
    990 F.2d 1426 (4th Cir. 1993) ........................................................... 13

*United States v. Doerr,*
    886 F.2d 944 (7th Cir. 1989) ......................................................... 18, 22

*United States v. Garcia,*
    65 F.4th 1158 (10th Cir. 2023) .......................................... 18-19, 21-22

*United States v. Gulley,*
    526 F.3d 809 (5th Cir. 2008) ............................................................ 17

ii

*United States v. Lopez,*
    860 F.3d 201 (4th Cir. 2017) ............................................... 21

*United States v. Lovasco,*
    431 U.S. 783 (1977) .................................................... passim

*United States v. Marion,*
    404 U.S. 307 (1971) ................................................... 16, 19

*United States v. Melendez-Gonzalez,*
    892 F.3d 9 (1st Cir. 2018) ............................................... 21

*United States v. Rogers,*
    118 F.3d 466 (6th Cir. 1997) ............................... 17, 18, 22, 31

*United States v. Shealey,*
    641 F.3d 627 (4th Cir. 2011) ............................................ 13

*United States v. Uribe-Rios,*
    558 F.3d 347 (4th Cir. 2009) ........................................ 41, 42

*United States v. Valenzuela-Bernal,*
    458 U.S. 858 (1982) ..................................................... 41

*United States v. Valona,*
    834 F.2d 1334 (7th Cir. 1987) ........................... 17, 18, 19, 27

**Statutes**

18 U.S.C. § 3231 ............................................................................. 1

18 U.S.C. § 3731 ............................................................................. 1

## STATEMENT OF JURISDICTION

On August 23, 2022, a federal grand jury in the Southern District of West Virginia charged David Gerald Minkkinen and Sivaraman Sambasivam in a thirteen-count indictment with violations of 18 U.S.C. §§ 1832, 1343, and 1001, thus conferring original jurisdiction on the district court under 18 U.S.C. § 3231. JA22-39. On May 31, 2023, a fourteen-count superseding indictment was returned. JA761-790. On June 26, 2023, the district court dismissed ten counts of the superseding indictment based upon a finding of pre-indictment delay. JA920-946. The United States filed a timely notice of interlocutory appeal of the district court's order. JA947-948. This Court has jurisdiction over this appeal under 18 U.S.C. § 3731.

## ISSUE PRESENTED

Defendants Minkkinen and Sambasivam were indicted following a lengthy and complex trade secret investigation, which included an internal investigation by a target corporation and pre-indictment discussions between the United States and defendants. Two potential witnesses died, and three states purged possibly relevant records during the course of the investigation. Did the district court err by dismissing ten counts of an indictment for pre-indictment delay based upon speculative claims of prejudice and despite finding no bad faith by the United States?

## STATEMENT OF THE CASE

### A. Investigation and Indictment

In late summer 2016, the United States Attorney's Office for the Northern District of West Virginia was informed that a whistleblower complaint was under investigation by state law enforcement entities regarding possible intellectual property theft and fraud by Sagitec Solutions, LLC ("Sagitec") regarding a software platform used to process unemployment claims by state agencies known as Unemployment Framework for Automated Claim & Tax Services ("uFACTS").[1] JA662, JA921, JA927-928. On February 3, 2017, after receiving sufficient factual predication to pursue the investigation, a formal matter was opened by the United States Attorney's Office. JA662, JA928.

Defendants David Gerald Minkkinen and Sivaraman Sambasivam previously worked for Deloitte and Touche LLP ("Deloitte") and its predecessor company, BearingPoint/KPMG, and helped to develop uFACTS. JA408-409, JA921. Minkkinen was the Unemployment Insurance Practice Leader and Sambasivam was the lead system architect for the uFACTS Solution Framework. JA921. The uFACTS platform was implemented in three states – New Mexico, Massachusetts, and Minnesota. JA921. The Minnesota software development project took place between

---

[1] Sagitec was ultimately not charged as part of the indictment.

2003 and 2008, the Massachusetts project began in 2007 and was completed in 2014, and the New Mexico contract began in 2010. JA925. For the Minnesota project, the defendants and BearingPoint worked with the Minnesota Department of Employment and Economic Development ("DEED"). JA408.

First Minkkinen and then Sambasivam separately left Deloitte in 2013 to work in a similar capacity at Sagitec. JA922. During 2013 through 2015, an additional nine employees of Deloitte made a similar move to Sagitec. JA922. As alleged in the superseding indictment, the defendants' employment contracts with Deloitte involved agreements not to disclose any proprietary property of Deloitte to any third party or to retain any such property. JA922. Despite this, and pursuant to an agreement between the defendants, they copied and downloaded Deloitte proprietary information, including source code,[2] data, and use cases,[3] related to the uFACTS software platform. JA922. These materials were exchanged via email, sometimes between the defendants and sometimes with other Sagitec employees. JA922. As one

---

[2] "Source code" is "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." JA348.

[3] "Use cases" are "detailed narratives describing how a business specifically implements each of its requirements and how that requirement fits into its business process." JA348.

3

example, in late 2013, and while still employed by Deloitte, Sambasivam sent emails regarding uFACTS software to Sagitec employees, including Minkkinen. JA922-923.

In approximately 2015, Sagitec entered into a contract with a consortium formed by Maryland and West Virginia (the "Consortium") to develop an unemployment insurance benefit claim software system. JA923. As part of the contract, which was signed by Minkkinen, Sagitec agreed that its work product would not infringe of propriety rights of any third party. JA923. In 2016, after West Virginia employees noticed references to Deloitte, Massachusetts, and New Mexico in the Sagitec project materials, a whistleblower contacted a West Virginia law enforcement agency. JA923. In July 2016, after Sagitec received a letter from the Maryland Attorney General's office concerning this issue, Minkkinen, with the help of Sambasivam, drafted and sent a response letter explaining that such references were innocent examples of "potential implementation options." JA923-924. The superseding indictment, however, asserts that defendants knew and firmly believed at the time that Deloitte considered the information found by the West Virginia employees to constitute trade secrets. JA924.

In both a follow-up letter from the defendants to the Maryland Attorney General and a meeting with Maryland officials, the defendants further denied that any Sagitec employee had ever retained any Deloitte materials or incorporated them into their work for the Consortium. JA924. These letters were ultimately provided to

4

law enforcement as part of the criminal investigation, and the defendants reasserted these denials to law enforcement during interviews. JA924.

Upon opening a formal investigation in early 2017, the United States Attorney's Office and law enforcement conducted approximately 31 interviews and reviewed substantial volumes of documents over the next two years. JA663. The issue at the center of the investigation — the theft of trade secrets involving computer software platforms — was, in the words of the defendants, "inherently complex, both factually and legally" and "highly technical" in nature, ultimately leading to over 750,000 pages of discovery. JA51-52.

Of relevance to this appeal, two names of other Sagitec employees came up during the investigation. Phil Tackett, who was employed by Deloitte and its predecessor from 2004 to 2006, 2007 to 2009, and 2010 through 2013, also began to work at Sagitec in 2019. JA411, JA926. Tackett's name was discovered in the metadata of Consortium documents, although Tackett was not employed by Sagitec or Deloitte at the time the documents were created. JA411-412, JA926. Tackett, who worked on the New Mexico project, was interviewed by law enforcement on August 7, 2019, and the interview was recorded. JA926. Tackett stated that it was his understanding that "at the end of the project it's common that the software and all the deliverables, meaning the use cases, the test cases, if there were training documentation, all those things, they become property of the State," although he admitted he did not know if

5

the product became the property of New Mexico or if the state was simply licensed to use it. JA646. Tackett also said he believed similarities between Deloitte and Sagitec materials might be attributable to the particular methods and formats that Minkkinen preferred to use when working on a project. JA648. Tackett denied having worked on many of the documents that cited his name in the metadata. JA649-650. Tackett died approximately six months later on March 30, 2020. JA652.

Bernt Peterson was another employee identified in August 2017 as having been a Deloitte employee who moved to Sagitec. Peterson worked on both the Minnesota and New Mexico uFACTS projects and also on the Consortium project at Sagitec. JA925-926. During the course of the investigation, Peterson was identified by law enforcement as having "potential criminal exposure" related to the case. JA663. On November 12, 2020, law enforcement recorded an interview of Peterson. JA925. During his interview, Peterson generally described the use and purpose of use cases and stated that he did not recall seeing any references to other states while working on the Consortium project. JA926. He also described how Deloitte employees developed documents for the New Mexico project from the Massachusetts project. JA926. Peterson admitted to taking Deloitte uFACTS materials with him when he left the company to work for Sagitec. JA411, JA669, JA926. Peterson asserted that the reason Deloitte metadata was found on Sagitec documents was that he would reuse old Deloitte use cases for formatting, replacing the content but retaining various

6

headers, footers, and metadata. JA411, JA926. Peterson advised that projects between states were so different that use cases would be of little value from one project to another, although he admitted that Sagitec would likely still view use cases as intellectual property. JA926. Peterson said he did not know if the defendants took any materials from Deloitte, and he did not believe they knew that he had taken materials. JA633-634, JA926.

Shortly after Peterson's interview, he retained an attorney who reached out to the Assistant United States Attorney on the case. JA663. On December 7, 2020, the Assistant United States Attorney proffered to Peterson's attorney regarding the investigation, including some significant contradictions between statements made by Peterson on November 12, 2020, and documentary evidence in the case. JA663. Peterson's attorney was also advised that the United States believed Peterson might have criminal exposure in the investigation related both to trade secret violations and false statements to a federal agent. JA663, JA669. Peterson's attorney arranged for a second interview to take place on December 15, 2020. JA663-664. However, on December 14, 2020, Peterson's family reported to law enforcement that he was missing, and it was later discovered that Peterson had "died unexpectedly" on December 13, 2020. JA636, JA664.

7

A few weeks after Tackett was interviewed, on December 3, 2019, the United States advised Sagitec that it was the target of a criminal investigation. JA928. In February 2020, after meeting with the United States, Sagitec initiated an internal investigation regarding the potential trade secret theft. JA928. While Sagitec conducted this investigation, the United States continued with its own investigation. On October 1, 2020, law enforcement interviewed Minkkinen. JA663. On October 13, 2020, Sagitec provided a completed report on its internal investigation, which prompted additional leads for the investigation and resulted in several additional document disclosures by Sagitec. JA663.

In December 2020, the United States advised Minkkinen that he was the target of a federal investigation. JA664. Sambasivam was subsequently interviewed on March 12, 2021, and served with a target letter on March 16, 2021. JA664. Both defendants retained counsel, and pre-indictment discussions between the parties ensued. JA664. In March 2021, the United States provided an hour-long proffer to Minkkinen's attorney, summarizing its theory of the case and showing various supporting documents. JA664. During the pre-indictment time frame, Minkkinen retained an expert, and on June 3, 2021, the United States conducted a video conference with the expert to discuss the case. JA664. The United States also met with Minkkinen's attorney in person on December 15, 2021. JA664. The United States engaged in

8

similar pre-indictment discussions via phone and email with original counsel for Sambasivam. JA664-665.

The United States' review of the substantial volume of discovery continued while pre-indictment discussions took place with the defendants. JA665. In November 2021, the United States discovered a 2014 email from Minkkinen to another Sagitec employee in which Minkkinen directed the employee to "check how uFACTS coded" a particular software function. JA665. This discovery prompted the production of hundreds of additional emails by Sagitec and called for another round of interviews, one taking place as late as July 21, 2022, approximately one month before the original indictment was returned in the case. JA665.

On August 23, 2022, a thirteen-count indictment was returned against the defendants charging them with violations of 18 U.S.C. §§ 1832, 1343, and 1001.

B.  *Motion to Dismiss for Pre-Indictment Delay*

On March 9, 2023, the defendants jointly filed a motion to dismiss for pre-indictment delay. JA400-426. The defendants argued that they were actually and substantially prejudiced regarding the loss of three types of evidence due to the lenghty pre-indictment investigation and negotiation period: 1) state documents related to the uFACTS projects in Minnesota, New Mexico, and Massachusetts; 2) the testimony of Phil Tackett; and 3) the testimony of Bernt Peterson. The defendants note that they issued Rule 17(c) subpoenas to various entities, including Minnesota, Massachusetts,

and New Mexico, but were able to obtain few documents due to data retention policies. JA416-417. The defendants specifically cite to a letter received from Minnesota regarding documents subpoenaed from DEED. JA656-659. The letter listed the retention periods for various types of documents (such as six years for contract documents) and noted that many, if not all, documents regarding the Deloitte project would certainly have been destroyed no later than May 2022, although they could have been destroyed prior to May 2022 during "periodic purges" of records or an office move. JA657. Minnesota's subpoena response letter noted that Sambasivam had previously submitted a similar public data request to the state in July 2022, a month before the indictment was returned. JA656.

The defendants argued that the various categories of documents they sought from the states could have provided "potentially exculpatory" information regarding the degree of collaboration between Deloitte and the states and whether the alleged trade secrets in this case were, in fact, trade secrets owned by Deloitte. JA417-419. They claimed that they were deprived of the possibility of presenting "concrete, corroborating evidence of their lived experience developing these products" because of delay by the United States. JA419. The defendants opined that as a result of the delay in indictment they were "left to speculate as to the content of these crucial pieces of potentially exculpatory evidence they cannot obtain." JA419.

10

The defendants also cited to the above-described interviews of Peterson and Tackett and claimed that their lost testimony would have been exculpatory and instrumental to their defense. JA421-424. They argued that but for the length of the investigation they "may not have been deprived of vital and exculpatory witness testimony." JA424. With regard to Tackett, they asserted that evidence of Tackett's name in metadata "can only be countered circumstantially" without his testimony. JA423. Asserting that there was no justification for the length of the investigation, the defendants moved for the indictment to be dismissed and requested that an evidentiary hearing be held to address the motion. JA424.[4]

The United States responded to the motion and outlined the timeline of the investigation and various alternative methods of obtaining the evidence the defendants argued had been lost. JA662-673. Following the completion of briefing on the motion, the United States obtained a superseding indictment that, in relevant part, altered the charges to eliminate the actual existence of a trade secret as an element of charged offenses. JA761-790. As a result of the superseding indictment, the district court ordered supplemental briefing on all pending motions in the case. JA816-817.

---

[4] Despite this request, the district court did not hold an evidentiary hearing to seek clarification on factual issues relevant to the motion.

11

On June 26, 2023, the district court issued its Memorandum and Order dismissing ten counts of the fourteen-count superseding indictment. JA920-946. The district court summarized the lost evidence at issue and concluded that the defendants had proven actual prejudice regarding the loss of "highly probative exculpatory evidence." JA938-393. The district court then turned to balancing this prejudice with the reasons for the delay. From the outset of that analysis, the district court found that the evidence did not demonstrate an improper motive by the United States in the timing of the indictment. JA940. However, while acknowledging that the investigation was ongoing and even "gained momentum" between February 2017 and the end of 2020, the district court found that "purported pre-indictment discussions and review of additional emails" were insufficient explanations to justify the time between the end of 2020 and the indictment in 2022. JA940-41. The district court also relied upon the fact that the delay in this case was lengthier than the delay in *United States v. Automated Medical Laboratories*, 770 F.2d 399 (4th Cir. 1985). JA941. The district court concluded that, due to the "unjustified" delay of the United States, the defendants had "been deprived of evidence and testimony that may well have persuaded a jury that they did not believe Deloitte owned any of the purported trade secret material." JA941. After a count-by-count analysis of the superseding indictment, the district court dismissed ten counts for pre-indictment delay. JA941-946.

12

The United States filed a notice of appeal the same day the district court's order was entered. JA947-948.

## STANDARD OF REVIEW

The Fourth Circuit reviews legal conclusions regarding Fifth Amendment due process violations based upon pre-indictment delay de novo. *United States v. Shealey*, 641 F.3d 627 (4th Cir. 2011). A district court's factual conclusions, such as whether the government delayed the investigation to gain a tactical advantage over a defendant, are reviewed for clear error. *United States v. Burns*, 990 F.2d 1426, 1435 (4th Cir. 1993). A due process violation occurs when pre-indictment delay "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (cleaned up).

## SUMMARY OF ARGUMENT

The district court erred when it found a Fifth Amendment due process violation based upon unjustified pre-indictment delay. Defendants bear the burden of proving actual, rather than speculative, prejudice, and the defendants failed to meet this "nearly insurmountable" standard as to the testimony of two deceased witnesses and various documents that had been purged under state data retention policies. The defendants failed to show that Bernt Peterson, a potential codefendant, would have

13

waived his Fifth Amendment right against self-incrimination and credibly testified consistent with his initial interview, which was riddled with statements that were contradicted by documentary evidence. The defendants also failed to prove that evidence from Phil Tackett's proffered testimony could not have been obtained from alternative sources or that his testimony was relevant to the point of being likely to sway the outcome of trial. Finally, the defendants merely speculated that the purged state documents *might* have contained information that could have possibly been exculpatory, and such speculation is insufficient to prove actual prejudice. The defendants also failed to demonstrate that alternative sources of the information they claimed was contained in the documents, such as witness testimony, were unavailable.

In addition to the defendants failing to meet their burden of showing any actual prejudice, the six-year time frame between the initiation of the investigation and the indictment was entirely related to a good-faith investigation of a complex and highly technical trade secret case that involved over 750,000 pages of documents. The investigation also included dozens of interviews, one occurring just a month before the indictment was returned. During the investigation, the United States gave the target corporation time to conduct a lengthy internal investigation, and pre-indictment discussions and proffers with counsel for the defendants also took place.

14

Any delay in indictment was investigative delay that was fully consistent with notions of justice and fair play and therefore could not have constituted a due process violation. The district court's order dismissing ten counts of the superseding indictment must be vacated.

## ARGUMENT

**The district court erred by dismissing ten counts of the superseding indictment for pre-indictment delay because the defendants failed to meet their burden to show actual prejudice and the reasons for the delay were justified.**

*A. Alleged due process violations from pre-indictment delay are evaluated under a two-step process in the Fourth Circuit.*

The Due Process Clause of the Fifth Amendment provides an avenue for defendants to challenge an indictment based upon an allegation of prejudicial pre-indictment delay. However, as statutes of limitations are the "primary guarantee against bringing overly stale criminal charges," the Fifth Amendment has only a "limited role to play in protecting against oppressive delay." *Lovasco*, 431 U.S. at 789. There is no bright-line rule as to when a due process violation occurs; instead, courts are to review the facts of a case to determine if the delay "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and

15

which define the community's sense of fair play and decency." *Id.* at 790 (cleaned up); *see United States v. Automated Medical Laboratories*, 770 F.2d 399, 404 (4th Cir. 1985).

While the majority of circuits place the burden on the defendant to prove an improper prosecutorial motive in addition to actual prejudice in order to succeed on a motion to dismiss for pre-indictment delay, in the Fourth Circuit the initial burden is placed upon a defendant only to prove actual prejudice. *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990). If a defendant meets this burden, a court then balances this demonstrated actual prejudice against the justification for the delay in indictment, determining directly whether the government's delay violated the fundamental conceptions of justice or the community's sense of fair play and decency. *Id.* Such a balancing test should keep in mind that "[a]ctual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *United States v. Marion*, 404 U.S. 307, 324-25 (1971).

A defendant faces a "heavy burden" to clear the first step of the inquiry. *Jones v. Angelone*, 94 F.3d 900, 907 (4th Cir. 1996). A defendant not only must prove that actual, rather than merely speculative, prejudice resulted from the delay; he also must show that such prejudice was substantial in that "he was meaningfully impaired in his

16

ability to defend against the . . . charges to such an extent that the disposition of the criminal proceeding was likely affected." *Id.*; *see also, e.g., Stoner v. Graddick*, 751 F.2d 1535, 1547 (11th Cir. 1985) (showing of actual prejudice requires a "reasonable probability" that absent the delay "the result of the proceeding would have been different").

If the alleged prejudice relates to a deceased witness, the defendant must identify the witness, demonstrate specifically the expected testimony of that witness, and show that the information provided by that witness was not available from alternative sources. *Jones*, 94 F.3d at 908; *see also United States v. Gulley*, 526 F.3d 809, 820 (5th Cir. 2008) (finding that a defendant "must show an actual loss of evidence that would have aided the defense and that cannot be obtained from other sources" to demonstrate actual prejudice regarding an unavailable witness). Courts have held that it "is clear that the death of a witness alone is insufficient to establish actual prejudice." *United States v. Valona*, 834 F.2d 1334, 1338 (7th Cir. 1987) (collecting cases). "Even where a defendant specifies what a deceased witness's testimony would have been, actual prejudice is difficult to prove." *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir. 1997). Put succinctly, "[t]he standard for pre-indictment delay is nearly

17

insurmountable, especially because proof of actual prejudice is always speculative." *Id.*
at 477 n.10.

In assessing prejudice when the anticipated testimony of a deceased witness is
known from prior interviews or testimony, a court should only find actual prejudice
if it is "convinced that [the witness] would have testified, that his testimony would
have withstood cross-examination, and that the jury would have found [him] a credible
witness." *Rogers*, 118 F.3d at 475; *see also United States v. Doerr*, 886 F.2d 944, 964 (7th
Cir. 1989) (same). The relevance and reliability of the purported testimony is also to
be considered. For example, in *Valona* the Seventh Circuit found no actual prejudice
from the death of a witness who allegedly could have testified to the defendant's lawful
purpose at a location where the defendant had been accused of selling drugs. 834 F.2d
at 1338. The court found that the witness's role was "too peripheral to view his
absence as substantially prejudicial" because he did not directly participate in the
allegedly criminal transaction. *Id.*

Along these lines, if an unavailable witness was a potential co-conspirator,
speculation that the witness would have waived his Fifth Amendment rights and
testified on behalf of the defense is insufficient to prove actual prejudice. *See*
*Automated Med. Labs*, 770 F.2d at 404 (finding slight, if any, prejudice based in part

18

upon the fact that the defendant had not demonstrated that the deceased co-conspirator would have waived his rights and testified); *see also United States v. Garcia*, 65 F.4th 1158, 1186 (10th Cir. 2023) (noting that it was probable that two potential codefendants who died prior to indictment would have been "unwilling to implicate themselves" during trial testimony). Finally, even if convinced that the testimony would actually have occurred as proffered, a court "must still evaluate this testimony against the other trial evidence to determine if indeed its introduction would affect the trial outcome." *Valona*, 834 F.2d at 1338.

A rare showing of actual prejudice does not make a claim automatically valid; it instead merely "makes a due process claim concrete and ripe for adjudication." *Lovasco*, 431 U.S. at 789. A showing of actual prejudice is not independently enough to show a due process violation because "actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *Marion*, 404 U.S. at 324-25. Actual prejudice, in other words, is a "necessary but not sufficient element of a due process claim." *Lovasco*, 431 U.S. at 790.

19

If a defendant can overcome the high hurdle of proving actual and substantial prejudice, the next step is to balance this prejudice against the government's justification for the delay. *Automated Med. Labs.*, 770 F.2d at 403-04. This inquiry is centered on *Lovasco*'s ultimate question of whether the delay in indictment violates the fundamental notions of justice and the community's sense of fair play.

While the Fourth Circuit does not require a defendant to prove bad faith or an attempt to gain tactical advantage by the government to succeed on a motion to dismiss for pre-indictment delay, good faith on behalf of the United States is a relevant consideration to determine if the delay violates notions of justice. Additionally, the reason for the delay — particularly whether the delay was investigative delay — is a key consideration when determining if the passage of time was justified. *See Lovasco*, 431 U.S. at 795 (investigative delay is viewed as "fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused precisely because investigative delay is not so one-sided") (cleaned up). Another consideration is which party is responsible for the delay, as a delay in indictment that can be attributed, at least in part, to a defendant (such as through pre-indictment negotiations) should not serve as a basis to impose the drastic remedy of dismissing the government's case.

20

Finally, *Automated Med. Labs.* did not establish a ceiling on the acceptable length of a pre-indictment delay. The Fourth Circuit has found that a six-year pre-indictment delay to allow for additional DNA testing was reasonable. *See United States v. Lopez*, 860 F.3d 201, 213 (4th Cir. 2017). Other courts have upheld similar time limits. *See, e.g., United States v. Melendez-Gonzalez*, 892 F.3d 9, 15 (1st Cir. 2018) (affirming the denial of a motion to dismiss regarding a 7-to-8-year delay).

> B. *Defendants failed to demonstrate actual, substantial prejudice that resulted from alleged pre-indictment delay by the government.*

Defendants Minkkinen and Sambasivam raised three losses of potential evidence that they claim constitute actual, substantial prejudice: 1) the death of Bernt Peterson; 2) the death of Phil Tackett; and 3) the purging of state government records from New Mexico, Massachusetts, and Minnesota. Defendants failed to make the necessary showing of actual prejudice as to all three issues, and the district court erred in finding that the evidence supported a finding of actual prejudice.

> 1. *Testimony of Bernt Peterson*

The United States indicated to the district court that Peterson had potential criminal exposure related to the trade secret case and lying to a federal agent. JA663, JA669. As several courts have noted, the testimony of a potential codefendant at trial is inherently speculative and cannot support a finding of actual prejudice. *See, e.g.,*

21

*Automated Med. Labs.*, 770 F.2d at 404; *Garcia*, 65 F.4th at 1186. The district court placed substantial weight on the fact that the defendants could provide a fairly detailed account of what Peterson told to law enforcement during his first interview. JA935-936. This account alone is insufficient to prove actual prejudice. As explained in *Rogers*, when assessing testimony, a court should be "convinced that [the witness] would have testified, that his testimony would have withstood cross-examination, and that the jury would have found [him] a credible witness" before finding actual prejudice. *Rogers*, 118 F.3d at 475 (citations omitted); *see also Doerr*, 886 F.2d at 964.

Defendants cannot meet their burden on any of these three requirements as to Peterson's proffered testimony. Whether Peterson would have waived his Fifth Amendment rights and testified as to the statements that he made to law enforcement is entirely unknowable. Peterson's initial statement to law enforcement, which defendants proffered (and the district court presumed) would have been the substance of his trial testimony, also lacked credibility and would have fared poorly on cross-examination. As Peterson's attorney had been advised, there were several portions of Peterson's statement that were specifically contradicted by documentary evidence; it was for this very reason that a second interview was arranged after government counsel explained the significant discrepancies to Peterson's attorney. JA663-664. This

22

interview only failed to occur because Peterson "died unexpectedly" two days prior to the interview. JA636. Whether that interview (and any subsequent trial testimony) would have been consistent with the first interview given the factual discrepancies with which Peterson would have been confronted during this second interview is inherently speculative.

Peterson's self-serving statements downplaying the utility of the use cases from Deloitte were also less than credible given that he confessed to appropriating approximately 30 to 40 of Deloitte's use cases from its New Mexico project when he left Deloitte to work with Minkkinen and Sambasivam at Sagitec. JA631. Peterson also admitted that Deloitte was likely unaware that he had taken those use case documents when he left. JA631. Defendants have not — and cannot — demonstrate that they suffered actual prejudice from speculative testimony that a jury would have been unlikely to find credible.

To the extent that Peterson's proffered testimony could have been considered accurate and credible, defendants failed to demonstrate that there were no alternative ways to obtain or introduce the evidence they claim Peterson would have provided. Peterson had no personal knowledge about whether Minkkinen or Sambasivam took materials from Deloitte. JA634. And Peterson was certainly not the only employee

23

from Deloitte who worked on the Minnesota and New Mexico projects – others involved could have testified about the same general information about "use case documents" and their utility from project to project. If other individuals from the New Mexico or Minnesota projects with similar institutional knowledge might not have supplied similarly favorable testimony, that is likely a reflection of the inaccuracy of Peterson's statements.

The timing of Peterson's death also makes it nearly impossible to attribute any alleged prejudice to pre-indictment delay. Peterson "died unexpectedly" on December 13, 2020, which was a month after he was first interviewed, less than a week after his attorney was advised of Peterson's potential criminal culpability, and two days before he was scheduled to meet again with law enforcement to address the "significant contradictions between Peterson's interview statements and documentary evidence." JA663-664. Based upon the timing of his death, Peterson would have been unavailable for trial even if the United States had indicted immediately following that interview. Moreover, Minkkinen was served with a target letter the same month as Peterson's death, and Sambasivam was not served with a target letter until three months after Peterson's death; Sambasivam was not even interviewed until March 2021. JA664. Peterson thus died before the United States would have even been in a position to

24

indict the defendants in good faith, that is, after a complete and thorough investigation including speaking with the suspects.

For all these reasons, it is highly speculative that Peterson, as a potential codefendant, would have testified at all, much less provided the kind of substantial, credible exculpatory evidence that would sway the outcome of the case. And given the timing of his death, there is little reason to believe that Peterson would have been available to testify even if the government had indicted the case years earlier. Defendants cannot establish any actual prejudice as to Peterson's proffered testimony that can be attributed to government delay, and therefore the motion to dismiss for pre-indictment delay should have been denied as to Peterson.

2. *Testimony of Phil Tackett*

Tackett's proffered testimony is similarly of minimal relevance, and the defendants failed to prove that the information could not have been obtained from other sources. The defendants failed to address why Tackett's general testimony about his understanding that New Mexico gained ownership of the software upon completion of the project, if true, could not have been provided by any other person then-employed by Deloitte who had worked on the New Mexico project (or other similar uFACTS projects) or employees of the state of New Mexico who were involved

25

in the contracts for the uFACTS project. To the extent that Minkkinen had his own distinctive format for creating software programs that might have innocently explained the similarities between Deloitte and Sagitec materials, the defendants did not demonstrate that such testimony could not have been obtained by any number of people who had worked with Minkkinen and knew of his favoring certain formats and methods. The burden of proving that no alternative means of obtaining the evidence to which Tackett would allegedly have testified exists rests with the defendants, and they failed to satisfy this burden.

Regarding Tackett's name appearing in metadata for documents upon which Tackett claimed he did not work, even the defendants conceded that there are circumstantial alternatives to explaining this metadata beyond his own testimony. JA423. Any witness with a basic familiarity with how metadata works could explain the various ways authorship metadata can be retained in a document despite the identified author not actually working on the document; the defendants did not prove that Tackett had unique information on how such metadata might have come to be included in the documents. The defendants further did not provide any evidence that Tackett alone was able to explain that he was not working for Deloitte or Sagitec when some documents with metadata identifying him as the author were created. Such

26

information could have readily been obtained from numerous other sources: his employment records; project records from Deloitte as to who worked on various projects; open-source records such as a Linkedin.com account; or testimony from individuals who actually worked on those projects. As defendants failed to prove that the substance of Tackett's allegedly exculpatory testimony was unavailable from other sources, they did not meet their initial burden of demonstrating actual prejudice resulting from his death.

Tackett's testimony, even if he were the only possible source of such information, is also more in line with the proffered testimony of a deceased witness in *Valona*. In that case, the witness would have testified generally as to the defendant's conduct on the day of the alleged offense but not regarding the specific criminal conduct at issue. The Seventh Circuit found that the witness's proffered testimony was "too peripheral to view his absence as substantially prejudicial" because he did not directly participate in or witness the allegedly criminal transaction. *Valona*, 834 F.2d at 1338. Tackett's testimony is similarly peripheral — during the time when defendants left Deloitte and allegedly stole what they believed to be trade secrets to take for use at Sagitec, Tackett was employed by neither Deloitte nor Sagitec. He therefore would have no direct knowledge of any conduct by defendants during that time or what the

27

defendants believed about whether the documents they stole constituted trade secret materials. The loss of his testimony thus cannot be considered "substantially prejudicial" to the point that it was likely to sway the outcome of the case.

The timing of Tackett's death, like that of Peterson's, also makes it nearly impossible to prove that government delay caused any alleged prejudice. Tackett's death in March 2020 was over six months prior to Minkkinen first being interviewed, nine months before Minkkinen was served with a target letter, and a full year before Sambasivam was interviewed and served with a target letter. JA652, JA663-664. At the time of Tackett's death, the internal investigation at Sagitec was far from complete and the criminal investigation was ongoing. JA663-664. Given that the United States, despite diligently pursuing a complex investigation, had not yet determined that the defendants should be served with target letters (or even be interviewed) at the time of Tackett's death, there is no basis to conclude that there was any prejudice caused by the government declining to seek a premature indictment against them.

Tackett's testimony would have been peripheral and readily supplied from other sources, and the timing of his death demonstrates that any alleged prejudice could not have been caused by a delayed indictment. The loss of his testimony does

28

not create any actual prejudice to defendants related to pre-indictment delay, and their motion to dismiss should have been denied.

### 3. *State Government Documents*

The loss of state government documents likewise fails to constitute actual prejudice that was attributable to government delay. As an initial matter, any argument that the United States was under an obligation to obtain or preserve these records is invalid. In its motion to dismiss, defendants repeatedly commented on the fact that the potential destruction of documents was "readily foreseeable" and the government "took no steps to mitigate" this potential purging of possibly exculpatory evidence. JA424; *see also* JA415, JA417, JA419, JA676. The district court in finding actual prejudice also criticized of the government's "failure to promptly seek out documents that may be subject" to document destruction policies and stated that the United States "apparently did not think to seek out documents" that would potentially be useful for the defense. However, as the Supreme Court held in *Arizona v. Youngblood*, "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 58 (1988). Of note, unlike the

29

evidence in this case, the evidence that was not preserved in *Youngblood* was evidence that was in the government's possession as part of the investigation. *Id.* at 53-54.

Any claim that the United States must go beyond its *Youngblood* evidence retention obligations and proactively prevent the loss of any and all documents held by third parties that *might* be useful to the defense to avoid a finding of actual prejudice in the pre-indictment delay context must be rejected as contrary to law. While the Fourth Circuit may not require a defendant to prove bad faith to find a due process violation for pre-indictment delay, a defendant still bears the burden of proving bad faith to show that the government committed a constitutional violation for failing to preserve evidence that the defense may have found useful. The district court already made a finding of fact that there was insufficient evidence for defendants to prove bad faith or an improper motive by the government, and as that finding is not clearly erroneous it should not be revisited by this Court. JA940.

Turning to the requirement of showing actual, rather than speculative, prejudice, defendants in their own briefing to the district court provided mere conjecture about whether state documents would have been exculpatory. *See, e.g.,* JA420 ("[Defendants] are now left *to speculate* as to the content of these crucial pieces of *potentially* exculpatory evidence they cannot obtain.") (emphasis added). An

30

assertion that documents *might* contain unspecified exculpatory evidence falls far short of the requirement to show actual prejudice. While defendants complain that the standard for actual prejudice articulated by the United States "would create a nearly insurmountable hurdle," that is exactly what the law requires. JA677.

The requirement to prove actual, rather than merely potential or speculative, prejudice resulting from the loss of evidence is "nearly insurmountable" for a very good reason: when moving to dismiss for pre-indictment delay, defendants are seeking the most extreme remedy available under law — termination of the prosecution of a crime for reasons other than the merits of the case. The barring of a prosecution for procedural reasons is generally contrary to the interests of justice and should be done only in the rarest of circumstances. In other words, the law intends that, when the remedy sought is drastic, the evidence supporting it must be essentially indisputable. *See, e.g., Rogers*, 118 F.3d at 477 n.10 ("The standard for pre-indictment delay is *nearly insurmountable*, especially because proof of actual prejudice is always speculative.") (emphasis added).

Defendants also failed to demonstrate that allegedly exculpatory information possibly contained in the state documents could not have been obtained through other sources, such as through testimony from those involved in the projects and the

contracting process, as certainly the defendants were not the only individuals with "lived experience developing these products." JA419. The Minnesota letter responding to defendant Sambasivam's Rule 17(c) subpoena stated that, in the process of searching for responsive documents, DEED "identified current staff with knowledge of or involvement in" Deloitte's Minnesota project; however, despite the burden resting on them, the defendants offered no explanation as to why such witnesses known to have knowledge of the project could not readily provide the same information that they allege might have been contained in documents purged by DEED. JA657. Defendants have failed to satisfy the high burden of showing actual and substantial prejudice from the loss of any documents that may have been previously held by Minnesota, Massachusetts, or New Mexico.

Additionally, defendants cannot demonstrate exactly when these various documents were purged by the states and thus cannot prove that such loss of evidence could be attributed to delays by the government. There is little particularized information regarding when such destruction may have occurred regarding the projects in Massachusetts and New Mexico. At least as to those two states, it is therefore essentially impossible for the defendants to meet their heavy burden to prove they were actually prejudiced by the period of investigation prior to indictment. The

Minnesota letter provides more information about the potential timeline for document destruction, but it also fails to meet the defendants' burden. JA656-659. While the letter indicates that contract documents regarding the Deloitte project would certainly have been destroyed no later than DEED's office move in May 2022, the specified retention period for such documents would have expired in 2014 and could easily have been purged during any of the "periodic purges" of records or another office move that occurred between 2014 and May 2022. JA657. The burden rests with the defendants to prove that they were actually prejudiced by the delay because such documents *would* have been available at an earlier point in the investigation, and the district court erred in shifting that burden to the United States to prove that such documents would *not* have been available if an indictment had been sought earlier. JA939.

While the exact timing of the destruction of state documents is unknown, what is known is that the defendants were on notice that they were targets of a federal investigation well before the indictment was returned. The pre-indictment evidence proffers by the United States to counsel for both defendants and to Minkkinen's retained expert would have alerted them to the nature of the allegations. Nothing prevented the defendants from taking steps to either obtain the relevant state records

33

or request that those records be preserved pending resolution of the criminal investigation. Defendants acknowledged that they have utilized Freedom of Information Act requests to obtain state records and therefore were fully aware of the process for using this mechanism to obtain documents. JA65. Further, Minnesota's subpoena response letter notes that Sambasivam actually did submit a public data request to the state in July 2022, a month *prior* to the indictment being returned. JA656.

That the defendants did not attempt to gather these records earlier than July 2022, after being identified as targets of a federal criminal investigation for more than a year, suggests that defense counsel prior to that time did not believe the records were worth obtaining. However, as evidenced by at least one known pre-indictment request for public records, it was not the return of the indictment that triggered the defendants to contemplate seeking out these documents. To the extent that the district court concluded that the relevant Minnesota documents were definitely destroyed in May 2022 rather than at a prior date, the defendants were certainly in an equally good position prior to May 2022 to have sent Minnesota their pre-indictment public records request as they were in July 2022. The defendants cannot prove that the *possibly* relevant documents were destroyed during any period of allegedly

34

unjustified pre-indictment delay such that they were prevented from obtaining exculpatory evidence.

Moreover, at the time when the district court emphasized that a purge definitely occurred — May 2022 — the delay was at least partially attributable to the defendants due to ongoing pre-indictment negotiations and discussions with the government. And if the records were destroyed by the states prior to Sagitec or the defendants being placed on notice that they were targets of this investigation, such destruction likely happened before the United States had developed sufficient evidence to justify sending target letters, much less seeking a good faith indictment.

Defendants cannot meet their high burden to prove actual prejudice resulting from any delay by the government in bringing an indictment as they cannot prove 1) the contents of the lost documents; 2) the reason that such information cannot be obtained from state employees with knowledge of the projects; 3) the time such documents were destroyed; and 4) the reason that alleged government delay prevented them from sending their pre-indictment public records requests at an earlier stage after learning they were targets of a criminal investigation. The district court erred in concluding that defendants had proven actual prejudice.

35

C. *The government's justification for the timing of the indictment was fully consistent with the fundamental notions of justice and fair play in our community.*

A court need not turn to the second part of the test regarding due process violations for pre-indictment delay — a balancing of the prejudice to defendant with the government's justifications for the timing of the indictment — unless a defendant first demonstrates actual and substantial prejudice. As explained above, the defendants here failed to meet this burden. However, even assuming actual prejudice existed, the government's reasons for any alleged delay were consistent with the fundamental notions of justice and fair play, and the defendants' motion should have been denied.

At the heart of the analysis for constitutional violations based upon pre-indictment delay is whether such alleged delay "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790 (cleaned up); *see Automated Med. Labs.*, 770 F.2d at 404. The specific test in the Fourth Circuit, including the balancing test to be considered following a demonstration by a defendant of actual prejudice, does not override *Lovasco*; it is simply the method courts are to follow when determining this broader standard set

36

forth by the Supreme Court. When viewed through this lens, any alleged delay in this case was justified and advanced, rather than undermined, the interests of justice.

Due to its nature, investigative delay is viewed as "fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused precisely because investigative delay is not so one-sided." *Lovasco*, 431 U.S. at 795 (cleaned up). Both the government and potential defendants have a significant interest in ensuring that crimes are fully investigated before an indictment is filed. For this reason, "rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them" when he refuses to seek indictments "until he is completely satisfied that he should prosecute and will be able to promptly establish guilt beyond a reasonable doubt." *Id.* The Supreme Court was clear in its holding on this issue: "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796.

The Supreme Court in *Lovasco* thoroughly addressed the reasons why good faith investigative delay will not violate a defendant's due process rights. When assessing the reasons for a delay in indictment, "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a

37

prosecutor's judgment as to when to seek an indictment." *Id.* at 790. While some prosecutors may elect to file charges as soon as they can establish probable cause, imposing a duty on prosecutors to indict prior to concluding that they could prove guilt beyond a reasonable doubt "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." *Id.* at 791 (citations omitted).

Any argument that a prosecutor is constitutionally obligated to indict as soon as she has acquired sufficient evidence to prove guilt beyond a reasonable doubt is equally harmful to fundamental conceptions of justice. Such a policy would "pressure prosecutors into resolving doubtful cases in favor of early — and possibly unwarranted — prosecution" to avoid a court dismissing a later indictment for pre-indictment delay. *Id.* at 793. Further, requiring prosecutors to rush to obtain an indictment as soon as they have gathered the minimum amount of evidence to convict "would preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases." *Id.* at 794. Delay to allow for such consideration — which may sometimes, such as in this case, involve pre-indictment discussions between prosecutors and defense counsel regarding potential mitigation or defenses that may advise against prosecution — is consistent with, rather than in violation of, the

38

fundamental notions of justice and fair play in our community. "Penalizing prosecutors who defer action [for the reasons stated above] would subordinate the goal of 'orderly expedition' to that of 'mere speed.'" *Id.* at 795. For this reason, a good faith investigative delay in indictment should *never* be considered a due process violation, even if actual prejudice is found to have occurred as a result of this investigative delay.

In *Automated Med. Labs.*, the Fourth Circuit acknowledged the importance of allowing for pre-indictment investigation. While the Court recognized that "the Government could possibly have acted with more dispatch" in the case, it found there was no delay occasioned upon bad faith by the prosecution. *Automated Med. Labs.*, 770 F.2d at 404. As it summarized the issue, "[t]he wheels of government bureaucracy may, at times, seem to turn at a frighteningly slow pace, but careful investigation and consideration prior to the bringing of charges is generally a wise policy." *Id.* As the Supreme Court also noted in *Lovasco*, awaiting the results of additional investigation — such as the additional investigation that took place after the November 2021 discovery of a highly relevant and inculpatory email — is a proper basis for delay in seeking an indictment. *Lovasco*, 431 U.S. at 796.

39

In *Howell*, a rare case where pre-indictment delay was found to violate the Fifth Amendment, the Fourth Circuit specified that the government did not make any assertion that the delay was based upon an ongoing investigation.[5] *Howell*, 904 F.2d at 895. Instead, and in direct contrast to the facts of this case, the prosecutors acknowledged the delay was for "mere convenience" and that the failure to prosecute earlier was negligent. *Id.* The Fourth Circuit made these distinctions after acknowledging the holding in *Lovasco* that good faith *investigative* delay would not violate due process. *Id.* at 894-95.

The complexity of a case is also relevant when considering if the time taken for an investigation was justified. A several-year investigation for a simple drug distribution case will be substantially harder to justify than an equally long investigation for a complicated fraud case involving hundreds of thousands of documents that must be reviewed, likely in consultation with an expert, to fully investigate the offense. When the Fourth Circuit in *Howell* dismissed the indictment for pre-indictment delay, it noted that the government had made no claim that the case at hand was complicated. *Id.* at 895. On the other hand, in *Automated Med. Labs.*,

---

[5] In *Howell*, actual prejudice was also conceded by the government, so the court simply assumed actual prejudice existed rather than completing a detailed analysis. *Howell*, 904 F.2d at 895.

40

the Fourth Circuit found the delay was justified due in part to the complexity of the case. "If delay results from a protracted investigation that was nevertheless conducted in good faith . . . to prosecute a defendant following investigative delay does not deprive him of due process." *United States v. Uribe-Rios*, 558 F.3d 347, 358 (4th Cir. 2009) (citations omitted). Here, a lengthy investigation was inevitable due to both the complex and specialized nature of the alleged crime and the immense volume of evidence. Rather than serving as an example of the government unjustifiably dragging out a simple and straightforward investigation, the timeline of this case falls squarely within the normal parameters of a thorough investigation of a complicated white-collar case that included pre-indictment discussions with potential targets.

Another consideration is what party is responsible for the delay. A due process violation may occur "when *the Government* has been responsible for delay resulting in a loss of evidence to the accused." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 868 (1982) (emphasis added). However, when the delays are in part attributable to the defendant, such a factor weighs against the finding of a due process violation. As noted in *Lovasco*, defendants have an interest in avoiding the many ramifications that follow from being indicted; when the defense engages in extensive pre-indictment discussions with the government to attempt to shield themselves from prosecution or achieve a

more favorable plea agreement, basic conceptions of justice and fair play require that such pre-indictment delay cannot be later used by the defendant as a sword to seek dismissal of the indictment.

The district court found that there was insufficient evidence establishing any improper government motive for the delay in indictment in this case. JA940. This finding was not clearly erroneous. The good faith of the government is still relevant to determining whether any delay violated the conceptions of justice or the community's sense of fair play and decency, even if the Fourth Circuit does not place a burden on defendants to prove bad faith. Instead, as the Court noted in *Uribe-Rios*, delay from a protracted, but otherwise good faith, investigation simply does not constitute a deprivation of due process. *Uribe-Rios*, 558 F.3d at 358.

The history of this case demonstrates that it involved a lengthy, complex investigation involving dozens of interviews and the review of hundreds of thousands of pages of materials that were obtained on a rolling basis from 2017 to 2022. The record also demonstrates that the investigation proceeded at a reasonable pace and in good faith from the start through indictment. As *Lovasco* and other cases set forth, prosecutors should never be penalized with dismissal of charges if the delay in indictment was due to good faith efforts to thoroughly investigate and assess a case

42

before taking the step of bringing federal charges, which is often a life-altering event for a defendant. This is true even if a district court believes the government "could possibly have acted with more dispatch" in the case. *Automated Med. Labs.*, 770 F.2d at 404.

Specifically, after opening a matter in early 2017, the United States spent two years conducting interviews and reviewing large volumes of documents. JA663. The subject of the investigation — trade secrets related to computer code — is also a highly specialized topic outside the expertise of most Assistant United States Attorneys, and therefore additional time was required for consultation with those with more expertise on the subject, including attorneys at the Department of Justice who specialize in computer and intellectual property crimes. By December 2019, the United States had gathered sufficient evidence to identify Sagitec as a potential target. JA928. After discussions with Sagitec's counsel, the corporation initiated an internal investigation that ran through October 2020. JA928.

Throughout 2020 the United States continued with its own investigation, and, in late 2020, began interviewing key individual targets of the investigation, including Minkkinen and Peterson. JA663. By March 2021, Sambasivam had also been interviewed, and both defendants had been served with target letters and obtained

43

counsel. JA664. During that same time frame, in addition to numerous phone and email exchanges, the United States proffered evidence and its theory of the case to attorneys for the defendants. JA664-665. These sessions included a June 2021 conference with Minkkinen's retained expert and a December 2021 in-person meeting with Minkkinen's attorney. JA664.

While conversations were ongoing with defense counsel, the United States continued its investigation during 2021, including review of the large volume of documents obtained in the case. In November 2021, the United States uncovered a significant email from Minkkinen, which led to Sagitec providing hundreds of additional relevant emails. JA665. This newly received evidence prompted additional interviews that took place as late as July 2022, a mere month before the defendants were indicted. JA665. This timeline confirms that the time between 2017 and the indictment did not involve unexplained or unjustified delays; it instead reflects a thorough and reasonable investigation of a complex and document-intensive matter.

Substantial periods of the investigation also included pre-indictment discussions with the defendants or allowing Sagitec (the initial target of the investigation) to complete an internal investigation on the matter. While these negotiations and discussions with the targets of the investigation delayed the bringing

44

of an indictment, they are squarely within the bounds of the conceptions of justice and fair play. As *Lovasco* held, rushing a prosecutor to indict undercuts the ability to decide whether a case *should* be brought, even if the government *could* prove guilt. *Lovasco*, 431 U.S. at 794. Here, the United States not only gave Sagitec time to conduct its own investigation and report its findings to the government, it also proffered evidence both to counsel for the defendants and an expert retained pre-indictment by Minkkinen.

By allowing the defense time to assess the case and conduct its own investigation before bringing the full weight of formal charges, the United States was providing the defendants with an opportunity to identify reasons they could present to the government as to why the case should not be brought at all (or determine that a resolution through an information plea was in the defendant's best interest). Rather than the United States simply blindsiding Minkkinen and Sambasivam with an indictment, the government engaged in transparent and good faith negotiations with the targets of its investigation to determine if a pre-indictment resolution was possible. This type of delay advances, rather than violates, principles of justice and fair play. The district court's dismissal of a large portion of the superseding indictment, on the other hand, both sends a distinct message to prosecutors that they should avoid

45

expending any time or effort on pretrial discussions with potential targets and provides an equally clear incentive to defense attorneys to engage in protracted pre-indictment negotiations and then later claim a due process violation.

Defendants should not be able to use delay that was equally attributable to them to shield themselves from prosecution — were such a situation allowed, it would again force prosecutors into the position of "indict now, negotiate later" in all cases to avoid being lured into a due process violation through pre-indictment discussions. This outcome benefits no one — the government, defendants, and society as a whole all lose when the government is compelled to rush into bringing criminal charges without full and thoughtful consideration of the merits of bringing a case.

In short, even if defendants had met the "nearly insurmountable" challenge of proving actual prejudice, the government's reasons for any delay advance, rather than violate, conceptions of justice and fair play. The district court erred as a matter of law in finding that, in its opinion, the government violated the Constitution because it should have moved faster in charging the case. *See Lovasco*, 431 U.S. at 790 ("the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment"). The government engaged in no bad faith conduct and indicted within the statute of

limitations following an appropriately thorough (if lengthy) investigation. There was not — and could not have been — a due process violation for pre-indictment delay in this case.

## CONCLUSION

For the foregoing reasons, the district court's order dismissing ten counts of the superseding indictment should be vacated.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

By:    s/Jennifer Rada Herrald
JENNIFER RADA HERRALD
Assistant United States Attorney

47

## STATEMENT REGARDING ORAL ARGUMENT

In accordance with Rule 34(a) of the Federal Rules of Appellate Procedure, the United States respectfully requests oral argument. Full argument would be beneficial in assisting the Court when making its decision.

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because this brief contains 10,023 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because the brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2016 in 14-point Goudy Old Style.


s/Jennifer Rada Herrald
JENNIFER RADA HERRALD
Assistant United States Attorney
Attorney for the United States

Date:     October 10, 2023

49

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 10, 2023, I electronically filed the foregoing

"BRIEF OF APPELLANT THE UNITED STATES OF AMERICA" with the Clerk of

court using the CM/ECF System, and service has been made on opposing counsel of

record by virtue of such electronic filing.


s/Jennifer Rada Herrald
JENNIFER RADA HERRALD
Assistant United States Attorney
Attorney for the United States